[Cite as *Kittis v. Cleveland Clinic Found.*, 2024-Ohio-659.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

GERALDINE KITTIS, INDIVIDUALLY
AND AS ADMINISTRATOR OF THE :
ESTATE OF DENNIS KITTIS,
DECEASED, :

      Plaintiff-Appellant, :

                          No. 112516

v. :

THE CLEVELAND CLINIC :
FOUNDATION,
                    :

      Defendant-Appellee.

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** February 22, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-19-920144

---

### *Appearances:*

Elk & Elk Co., Ltd., Marilena DiSilvio, and Ian Fijalkovich;
Flowers & Grube, Paul W. Flowers, and Kendra N. Davitt,
*for appellant.*

Roetzel & Andress, LPA, Stephen W. Funk, Emily K.
Anglewicz, and Joseph E. Herbert, *for appellee.*

MARY EILEEN KILBANE, P.J.:

{¶ 1} Plaintiff-appellant Geraldine Kittis, individually and as administrator of the Estate of Dennis Kittis, deceased ("Kittis"), appeals the trial court's granting the motion in limine and motion for summary judgment filed by defendant-appellee The Cleveland Clinic Foundation ("the Clinic"). For the following reasons, we reverse and remand.

**Factual and Procedural History**

{¶ 2} On January 4, 2018, the decedent, Dennis Kittis ("Dennis"), sought medical treatment at Fairview Hospital due to abdominal pain. A CT scan identified a bowel obstruction. When Dennis failed to respond to conservative treatment, he underwent bowel surgery on January 5, 2018.

{¶ 3} On January 6, 2018, the day after surgery, Dennis's lactic acid levels fluctuated throughout the day, including sharp increases. Dennis's decreased urine output, or renal dysfunction, was also noted. The Clinic's doctors attributed the high lactic acid levels to dehydration and administered intravenous fluids. A CT scan was ordered but cancelled prior to its execution.

{¶ 4} Around 5:30 p.m. on January 6, 2018, Dennis was admitted to the Intensive Care Unit ("ICU"), where he continued to be monitored and received intravenous fluids. At 5:23 p.m. on January 7, 2018, Dennis underwent a second surgery where the doctors observed 500 centimeters of ischemic bowel. Ischemia occurs due to inadequate blood flow. The surgeon noted the bowel was potentially viable and did not resect any portions of it. Following the second surgery, Dennis's

status declined. On January 8, 2018, Dennis underwent a number of medical procedures including dialysis, and he was placed on a ventilator. Unfortunately, Dennis died at 10:00 p.m. on January 8, 2018.

{¶ 5} On August 21, 2019, Kittis filed a complaint against the Clinic asserting claims of medical negligence and wrongful death. The Clinic denied liability or wrongdoing. Dr. David Brooks ("Dr. Brooks"), the plaintiff's medical expert, provided his medical opinion in a report dated August 29, 2019, a supplemental report dated January 24, 2022, and deposition testimony secured by defense counsel on February 16, 2022.

{¶ 6} In his August 29, 2019 report, Dr. Brooks states the following:

At your request, I have reviewed a variety of records regarding the care provided to Dennis Kittis at the Fairview Hospital from January 4, 2018 until his death on January 8, 2018. On the basis of my education, training and experience, and with a reasonable degree of medical certainty, I believe that this care did not meet generally accepted standards and this negligent failure to meet the standards of care was the proximate cause of his demise.

* * *

[On January 5, 2018, Dennis] was taken to the OR at 2:34 pm and underwent a diagnostic laparoscopy, laparoscopic lysis of adhesions, a mini-laparotomy and repair of an enterotomy.

* * *

Post-operatively, his immediate recovery was uneventful.

* * *

[Dennis's] white blood cell count rose from 14.36 at 0522 on 1/6/18, to 16.73 at 1806 the same day. Far more worrisome, however, was the fall in his bicarbonate ($CO_2$) from 25 (normal) at 0522 to 15 at 1806. This

drop is indirect evidence of progressive acidosis, and in the setting of a recent laparoscopy/laparotomy, should have raised suspicion that a catastrophic event had occurred intra-abdominally. Likewise, his rapid increase in creatinine from 1.21 to 2.55 at 0100 on 1/7/18, should have prompted a more aggressive investigation into the cause of his rapid deterioration.

* * *

Shortly [after 3:00 a.m. on January 7, 2018], he was intubated and a central venous line was placed. Over the course of the next 12-15 hours he was managed in the ICU before being taken to the OR by Toms Augustin, assisted by Hideo Takahashi. They found [over 500 centimeters of ischemic bowel.] [Toms Augustin] opined the possibility that torsion had existed and opted not to resect the bowel.

Returning to the ICU, a dialysis catheter was placed and CRRT was instituted. He continued to deteriorate with worsening acidosis and ARDS. Eventually, the futility of continued care was recognized and discussed with the family and eventually active care was withdrawn and he succumbed to multi-system organ failure.

In summary, this 74-year-old gentleman presented with a bowel obstruction secondary to an intra-abdominal adhesion. * * * Following [surgery, Dennis] initially did well, but within less than 24 hours post-operatively, his condition began to deteriorate, with clear-cut evidence of an intra-abdominal process highly suspicious for ischemia. That notwithstanding, the multiple physicians caring for him failed to recognize this in a timely fashion that would have allowed exploration and resuscitation. When he was eventually taken to the OR well over 18 hours after his condition had changed, the ischemia had progressed beyond the point of reasonably salvaging him. Dr. Augustin hints, although does not clearly state, his concern that there was torsion of the small bowel on its mesentery, something that could easily have occurred when his exteriorized bowel was "pushed" into the abdomen at the original operation through a very small incision.

Regardless of the etiology of the ischemia, the failure of his physicians to recognize in a timely fashion the progressive acidosis and renal dysfunction was the proximate cause for his eventual demise. Had it been recognized sooner, I believe with a reasonable degree of medical certainty, that he could have been salvaged.

Dr. Brooks, August 29, 2019 report.

{¶ 7} In his supplemental report provided one and a half years later, Dr. Brooks stated, in pertinent part:

> I disagree with [Dr. Burdette's] contention that a CT scan of the abdomen and pelvis would not have helped to differentiate the etiology of the decompensation that began on January 6th. * * * It is my opinion to a reasonable degree of medical certainty that had a CT of the abdomen been done, it likely would have shown evidence of significant abnormality in the small bowel suggestive of progressive low flow, including edema and thickening of the bowel wall. It is further my opinion that given these findings, the standard of care would have required [Dennis] to be returned to the operating room for exploration, which was not done.
>
> I also agree with Dr. Burdette that [Dennis] was given an extraordinary amount of fluid over the two days between January 5th and January 7th. There was no reason he would have required that much fluid. The failure of [Dennis] to respond to this massive fluid load should have alerted the physicians caring for him that this was not vast third-spacing after a relatively simple and straight-forward procedure that lasted barely an hour and lost a total of 25 cc of blood. Rather, a more critical intraabdominal process had/was occurring and the physicians caring for him failed to recognize this obvious disparity; the standard of care required the physicians to more thoroughly investigate the process.
>
> * * *
>
> In fact, a review of the laboratory values should have alerted him to the fact that sometime between 5 AM and 6 PM on 1/7/18, [Dennis] had become markedly acidotic, with his serum bicarbonate going from a normal 25 to 15. This number should have prompted an investigation into the etiology of the acidosis. If it was felt that this was primarily a renal issue, then some explanation for how a 75-year-old gentleman, who routinely ran 5 miles a day and who had a normal creatinine on admission, could have sustained such a metabolic injury after a brief operation. Far and away the most likely source of this deterioration had to be an intra-abdominal catastrophe.

Furthermore, Dr. Schirmer disagrees with my statement that had Mr. Kittis been taken to the operating room sooner he would have survived. Dr. Schirmer claims that Dr. Augustin did not find an intra-abdominal process that would explain why [Dennis] was so ill. I do not understand how Dr. Schirmer can claim that over 500 cm of ischemic bowel is a normal finding on laparotomy. As for the mechanism of the event, I merely expanded on the etiology put forth by Dr. Augustin when he comments on the "suspicion that maybe there was some torsion that existed." Additionally, when a loop of bowel is eviscerated through an incision short enough to be closed by a single figure of eight suture, there is an increased likelihood of creating a torsion when the "bowel was pushed back into the abdominal cavity."

* * *

In summary, following the exploratory laparoscopy, lysis of adhesions and mini laparotomy on January 5, 2018, [Dennis's] post-operative course rapidly deteriorated and within 24 hours he demonstrated evidence of profound acidosis with worsening renal function and eventually requiring intubation at 14:32 on January 7th. The probability that an intra-abdominal catastrophe had occurred briefly entered Dr. Augustin's mind when he mentioned the plan of taking him to the OR for exploration. Why that was not done and why, instead, [Dennis] was subjected to progressive fluid overload (more than 10 liters of fluid in excess of his daily requirement), is both unclear and an indefensible breach of the standard of care. I hold these opinions to degree of medical certainty.

Dr. Brooks, January 24, 2022 report.

{¶ 8} Defense counsel secured Dr. Brooks's discovery deposition during which Dr. Brooks testified it was more likely than not that had the CT scan been obtained as originally scheduled it would have shown significant abnormality in the bowel including wall thickening, gas, and fluid. Tr. 55. Dr. Brooks also stated "there is no question that the degree of acidosis that had developed over the course of time was related to something that was going on in the bowel." Tr. 61. Dr. Brooks stated to a reasonable degree of medical probability that Dennis stopped making urine 24-

hours after his initial surgery because of profound acidosis. Tr. 72-73. Dr. Brooks stated to a reasonable degree of medical probability that Dennis had a surgically correctable problem on January 6, 2018, if the Clinic had completed a second surgery on that day. Tr. 75.

{¶ 9} Dr. Brooks also testified that he could not state with a reasonable degree of medical probability that Dennis's bowel ischemia was caused by torsion, a blood clot, or venous obstruction. Tr. 66, 77. Dr. Brooks testified that he could not state with the requisite degree of probability that had the Clinic initiated the second surgery earlier that they would have found a "venous problem." Tr. 77

{¶ 10} On May 31, 2022, the Cleveland Clinic filed a motion in limine seeking to limit the expert testimony of Dr. Brooks. The portion of the motion that is relevant to this appeal sought to exclude "testimony from Dr. Brooks on the issues of proximate causation that are speculative and will not be able to establish prima facie evidence necessary to support the cause of action." Motion in limine, p. 1. Specifically, the Clinic argued that Kittis had the burden to establish more likely than not the proximate cause of Dennis's injuries and damages. The Clinic argued that Dr. Brooks hypothesized that a closed loop obstruction ("torsion"), blood clot, or venous obstruction were surgically correctable causes of Dennis's ischemic bowel, but he could not state with reasonable medical probability that any one of those causes occurred. Kittis opposed the motion. On June 15, 2022, the trial court, in a 14-page memorandum of opinion and order, concluded that Dr. Brooks failed to state with a reasonable degree of medical probability that (1) one of the etiologies —

torsion, a blood clot, or venous obstruction — were findable, identifiable, and repairable causes of Dennis's bowel ischemia or (2) one of the three named etiologies was the most probable cause of Dennis's bowel ischemia and that with surgical intervention earlier than midnight on January 6, 2018 the cause would have been findable, identifiable, and surgically repairable. The trial court granted the portion of the Clinic's motion in limine seeking to exclude Dr. Brooks's proximate cause testimony.

{¶ 11} On June 21, 2022, Kittis filed a motion for reconsideration of the motion in limine and attached Dr. Brooks's affidavit dated June 21, 2022. On June 22, 2022, the trial court heard oral arguments on the motion for reconsideration and denied the motion on June 23, 2022.

{¶ 12} On August 19, 2022, the Clinic filed a motion for summary judgment arguing that Kittis's expert witness, Dr. Brooks, failed to provide expert testimony to a reasonable degree of medical probability that the alleged breach in the standard of care by the Clinic proximately caused death or injury to Dennis. Absent such testimony, the Clinic argued it was entitled to a motion for summary judgment. The parties fully briefed the issue, and on February 17, 2023, the trial court granted the Clinic's motion for summary judgment.

{¶ 13} On March 15, 2023, Kittis filed an appeal from the trial court's order granting the Clinic's motion for summary judgment and presented two assignments of error:

Assignment of Error I: The trial court abused its discretion in granting [the Clinic]'s motion in limine to exclude the testimony of plaintiff's causation expert, Dr. Brooks.

Assignment of Error II: The trial court erred in granting [the Clinic]'s motion for summary judgment.

## Legal Analysis

## Motion in Limine

{¶ 14} "[A] trial court's ruling on a motion in limine is generally not a final order as it is a tentative or interlocutory ruling." *Grady v. Charles Kalinsky, D.D.S., Inc.*, 165 Ohio App.3d 306, 2005-Ohio-5550, 846 N.E.2d 537, ¶ 12, fn. 3 (8th Dist.). However, when a final judgment is entered terminating an entire case, all prior interlocutory orders merge into the final judgment and are appealable at that time. *Heaton v. Ford Motor Co.*, 2017-Ohio-7479, 96 N.E.3d 1191, ¶ 20 (8th Dist.), citing *Lingo v. Ohio Cent. R.R.*, 10th Dist. Franklin No. 05AP-206, 2006-Ohio-2268, ¶ 17. The granting of the Clinic's motion for summary judgment is a final judgment and due to that ruling, the interlocutory order on the motion in limine merged with the summary judgment ruling and is ripe for appeal. *Grady* at ¶ 12, fn. 3.

{¶ 15} We review a trial court's ruling on a motion in limine under an abuse of discretion standard. *United States Bank v. Amir*, 8th Dist. Cuyahoga No. 97438, 2012-Ohio-2772, ¶ 18, citing *Sokolovic v. Hamilton*, 195 Ohio App.3d 406, 2011 Ohio 4638, 960 N.E.2d 510, ¶ 13 (8th Dist.). The term abuse of discretion "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217,219, 450 N.E.2d 1140 (1983). An abuse of discretion

occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35.

> Pursuant to Evid.R. 702,
>
> [a] witness may testify as an expert if all of the following apply:
>
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
>
> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
>
> (2) The design of the procedure, test, or experiment reliably implements the theory;
>
> (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

Evid.R. 702. Specifically, "Evid.R. 702(C) requires that an expert's testimony be 'based on reliable scientific, technical, or other specialized information.'" *Lucsik v. Kosdrosky*, 2017-Ohio-96, 79 N.E.3d 1284, ¶ 14 (8th Dist.). A trial court has broad discretion when determining the admission of evidence. *Lucsik* at ¶ 16, citing *Blair*

*v. McDonagh*, 177 Ohio App.3d 262, 2008-Ohio-3698, 894 N.E.2d 377, ¶ 28 (1st Dist.).

{¶ 16} "To prevail on a claim of medical malpractice, a plaintiff must establish through expert testimony the acceptable medical standard of care, the defendant's breach of that standard, and that the breach proximately caused the plaintiff's injuries." *Schura v. Marymount Hosp.*, 8th Dist. Cuyahoga No. 94359, 2010-Ohio-5246, ¶ 27, citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976).

{¶ 17} In *Bruni*, the Ohio Supreme Court explained a plaintiff's burden as follows:

> Under Ohio law, as it has developed, in order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or commission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things. *Ault v. Hall* (1928), 119 Ohio St. 422, 7 Ohio Law Abs. 44, 164 N.E. 518 (Citations omitted.)

*Bruni* at 131. Expert testimony is generally required to establish both negligence and that the negligence was the proximate cause of the alleged injury. *Bruni* at 130.

{¶ 18} This court has found that

> [i]n Ohio, the admissibility of expert testimony on the issue of proximate cause is contingent on the expression of an opinion with respect to the causative event in terms of probability. *Stinson v. England*, 69 Ohio St.3d 451, 455, 1994-Ohio-35, 633 N.E.2d 532. "[A]n event is probable if there is a greater than fifty percent likelihood that

it produced the occurrence at issue." *Id.* However, there is no requirement that an expert utter any magic words in terms of a reasonable degree of medical certainty or probability. *Blair v. McDonagh*, 177 Ohio App. 3d 262, 2008-Ohio-3698, ¶ 27, 894 N.E.2d 377 (1st Dist.); *Coe v. Young*, 145 Ohio App.3d 499, 504, 763 N.E.2d 652 (11th Dist.2001); *Frye v. Weber & Sons Serv. Repair*, 125 Ohio App.3d 507, 514, 708 N.E.2d 1066 (8th Dist.1998). Rather, the expert's testimony, when considered in its entirety, must be equivalent to an expression of probability. *Jeffrey v. Marietta Mem. Hosp.*, 10th Dist. Franklin Nos. 11AP-492 and 11AP-502, 2013-Ohio-1055, ¶ 48; *Frye* at 514.

*Lucsik*, 2017-Ohio-96, 79 N.E.3d 1284, at ¶ 14 (8th Dist.). Kittis was required to "prove causation through medical expert testimony in terms of probability to establish that the injury was, more likely than not, caused by the defendant's negligence." *Roberts v. Ohio Permanente Med. Group*, 76 Ohio St.3d 483, 485, 668 N.E.2d 480 (1996), citing *Shumaker v. Oliver B. Cannon & Sons, Inc.*, 28 Ohio St. 3d 367, 504 N.E.2d 44 (1986).

{¶ 19} In its motion in limine, the Clinic argued that Dr. Brooks testified torsion, a blood clot, or venous obstruction could have caused Dennis's ischemic bowel. The Clinic argued that Dr. Brooks did not opine to a reasonable degree of medical probability that any of these potential causes occurred nor could he provide any other explanations. The Clinic argued that Dr. Brooks could not and did not opine to a reasonable degree of medical probability that a second surgery completed prior to midnight on January 6, 2018, would have resulted in the surgeons specifically finding either torsion, a blood clot, or a venous obstruction. Absent such testimony, the Clinic contended that Kittis "failed to establish that an earlier surgery would likely have found a surgically correctable problem and therefore cannot

establish that [Dennis's] injuries and subsequent death were likely avoidable." Motion in limine, p. 9. In support of its motion in limine, the Clinic attached as exhibits Dr. Brooks's curriculum vitae; excerpts from Dr. Brooks's deposition testimony; and Dr. Brooks's August 28, 2019 report.

{¶ 20} In opposition to the motion in limine, Kittis argued that Dr. Brooks's testimony stated, "to a reasonable degree of medical probability that [Dennis] had a surgically correctable problem on January 6th which was the proximate cause of his death." Brief in opposition to motion in limine, p. 12. In support of its brief, Kittis provided excerpts from Dr. Brooks's deposition testimony and Dr. Brooks's curriculum vitae.

{¶ 21} The trial court stated in its memorandum of opinion and order that the issue was whether Dr. Brooks's proximate cause testimony was speculative and, therefore, inadmissible under Evid.R. 702. The trial court observed that there must be a causal connection between the Clinic's action or inaction and the manner of death. *Chaney v. Eason*, 8th Dist. Cuyahoga No. 72142, 1997 Ohio App. LEXIS 5786, 5-6 (Dec. 24, 1997). The trial court further noted that Dr. Brooks's expert opinion had to be reliable, as required under Evid.R. 702(C). In evaluating reliability, "a court must assess whether the reasoning or methodology underlying the testimony is scientifically valid," but not whether the conclusions are correct. *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 611, 687 N.E.2d 735 (1998), citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-293, 113 S.Ct.

2786, 125 L.Ed.2d 469 (1993). Additionally, the expert testimony must aid the factfinder to determine a fact issue or understand the evidence. Evid.R. 702(C).

{¶ 22} The trial court's decision on the motion in limine stemmed from a comparison of Dr. Brooks's deposition testimony with his August 29, 2019 report, and the trial court's conclusion that the report and deposition testimony were contradictory. The August 29, 2019 report stated, specifically:

> Regardless of the etiology of the ischemia, the failure of [Dennis's] physicians to recognize in a timely fashion the progressive acidosis and renal dysfunction was the proximate cause for his eventual demise. Had it been recognized sooner, I believe with a reasonable degree of medical certainty, that [Dennis] could have been salvaged.

The trial court interpreted the above passage to mean Dr. Brooks believed an earlier second surgery would have found one of the three causes of ischemia the doctor referenced during his deposition — torsion, a blood clot, or a venous obstruction — and the problem would have been surgically repairable.[1] The trial court also found that Dr. Brooks testified during his deposition that he could not state within a medical degree of probability that torsion, a blood clot, or a venous obstruction

---

[1] We do not agree with the trial court's characterization of the August 29, 2019 report nor do we find contradictions between the report and Dr. Brooks's deposition testimony. The trial court's interpretation of the August report assumes information that is not contained therein. We interpret the cited paragraph from the August 29, 2019 report to state that the Clinic's failure to timely recognize Dennis's progressive acidosis and renal dysfunction proximately caused his eventual demise and this conclusion was not dependent upon the etiology or cause of Dennis's bowel ischemia. This statement is consistent with Dr. Brooks's deposition testimony that he could not state to a degree of medical certainty whether torsion, a blood clot, or a venous obstruction was the cause of Dennis's bowel ischemia.

caused Dennis's bowel ischemia. The trial court viewed this deposition statement as contradictory to Dr. Brooks's August 29, 2019 report.

{¶ 23} Further, the trial court explained in its order that Dr. Brooks could not render the requisite expert opinion without identifying the etiology or cause of Dennis's ischemic bowel:

> The etiology of the ischemia matters when Dr. Brooks later testifies to the possible causes of the ischemia and cannot say with reasonable degree of medical certainty the probability of any one being the cause of the ischemia or the probability of any of the causes of the ischemia being found and corrected.
>
> * * *
>
> His inability to opine as to a reasonable degree of medical certainty to any one of the three alternatives, or finding that all three were possible and at least one was findable and surgically correctable if brought to surgery sooner renders his opinions unreliable. See *O'Connor*, at 40-41.

Memorandum of Opinion and Order, June 15, 2022, p. 11-12. The trial court cited *O'Connor v. Fairview Hosp.*, 8th Dist. Cuyahoga No. 98721, 2013-Ohio-1794, in support of this conclusion. The trial court granted the Clinic's motion in limine thereby excluding Dr. Brooks's proximate cause testimony.

{¶ 24} In contrast, we find the holding in *O'Connor* demonstrates Dr. Brooks proffered his opinion with the requisite degree of probability, and the trial court abused its discretion when it granted the Clinic's motion in limine.

{¶ 25} In *O'Connor*, plaintiff-appellee O'Connor filed a medical malpractice action against defendants-appellants hospital and anesthesiologist as a result of an injury sustained during O'Connor's open-heart surgery. The plaintiff's medical

expert, Dr. Weingarten, opined that during surgery O'Connor experienced external pressure to his upper extremity that resulted in a brachial plexus injury. Dr. Weingarten further opined that one of two mechanisms, or a combination of the two, caused the external pressure. The two mechanisms were (1) inadequate or improper padding around O'Connor's right arm during surgery or (2) someone leaning against O'Connor's arm during surgery. Dr. Weingarten stated to a reasonable degree of medical probability that external pressure, regardless of how it was applied, fell below the standard of care and was the proximate cause of plaintiff's injury. Dr. Weingarten did not testify about the probability of his two theories and, therefore, there was no medical testimony stating which mechanism caused the external pressure or the probability associated with each mechanism. The trial court denied defendants-appellants' motion in limine that sought to exclude Dr. Weingarten's expert testimony.

{¶ 26} On appeal, this court determined Dr. Weingarten's testimony did not proffer alternate theories of proximate cause but opined that external pressure was the proximate cause of O'Connor's injury. The *O'Connor* Court further determined that Dr. Weingarten's testimony met the required standards of medical probability, and the trial court did not abuse its discretion when it denied the defendants-appellants' motion in limine.

{¶ 27} Similarly, Dr. Brooks did not opine, to a reasonable degree of medical probability, whether torsion, a blood clot, or venous obstruction caused Dennis's bowel ischemia. But, Dr. Brooks did testify, to a reasonable degree of medical

probability, that the Clinic's failure to recognize Dennis's symptoms was the proximate cause of his injuries and death. Just as the *O'Connor* Court found that Dr. Weingarten's testimony was sufficient to establish external pressure was the proximate cause of O'Connor injuries, we find that Dr. Brooks's expert testimony was sufficient to establish that the Clinic's failure to recognize in a timely fashion the progressive acidosis and renal dysfunction was the proximate cause of Dennis's injuries and death. Dr. Brooks's report stated the inability to identify the cause of Dennis's bowel ischemia did not impact his conclusions, and we will not unilaterally determine additional medical conclusions are required.

{¶ 28} Dr. Brooks's initial report and deposition testimony stated that Dennis's acidosis and renal dysfunction indicated a catastrophic intra-abdominal event that necessitated a second, exploratory surgery prior to midnight on January 6, 2018. Dr. Brooks also opined that Dennis had a surgically correctable problem causing his bowel ischemia, and if the Clinic had initiated the second surgery on January 6, 2018, it would have discovered the problem, and Dennis could have been salvaged.[2] Dr. Brooks's August 28, 2019 report stated his opinion on proximate

---

[2] The clinic argues Dr. Brooks's use of the words "could have been salvaged" in his August 28, 2019 report does not state his opinion to the required degree of probability. However, Ohio law does not require an expert to utilize "magic words" in his opinion. *Lucsik*, 2017-Ohio-96, 79 N.E.3d 1284, at ¶ 15 (8th Dist.). "An expert's testimony, when considered in its entirety, must be equivalent to an expression of probability." *Lucsik* at ¶ 15, citing *Jeffrey v. Marietta Mem. Hosp.*, 10th Dist. Franklin Nos. 11AP-492 and 11AP-502, 2013-Ohio-1055, ¶ 48; *Frye*, 125 Ohio App.3d 507, 514, 708 N.E.2d 1066, at 514 (8th Dist.1998).

In his August 28, 2019 report, Dr. Brooks stated: "Regardless of the etiology of the ischemia, the failure of his physicians to recognize in a timely fashion the progressive

cause was regardless of the etiology or cause of the ischemic bowel. Looking at his report and testimony in their entirety, Dr. Brooks rendered these opinions to a reasonable degree of medical probability.

{¶ 29} Dr. Brooks testified that the three potential etiologies he would attribute to causing Dennis's bowel ischemia were torsion, a blood clot, or venous obstruction. Dr. Brooks could not testify within a reasonable degree of medical probability which etiology caused Dennis's ischemic bowel, nor could he testify with the necessary probability that if the Clinic looked for these problems during a second surgery that such a problem would have been found. However, it was not necessary for Dr. Brooks to proffer this additional medical testimony once he opined, to a reasonable degree of medical probability, that (1) the Clinic's failure to recognize in a timely fashion Dennis's progressive acidosis and renal dysfunction was the proximate cause for his eventual demise, and (2) Dennis had a surgically correctable problem had he undergone a second surgery on January 6, 2018.

---

acidosis and renal dysfunction was the proximate cause for his eventual demise. Had it been recognized sooner, I believe with a reasonable degree of medical certainty, that he could have been salvaged." August 28, 2019 report, p. 4. In his January 24, 2022 report, Dr. Brooks further opined that: "Furthermore, Dr. Schirmer disagrees with my statement that had Mr. Kittis been taken to the operating room sooner he would have survived." January 24, 2022 report, p. 2. And during his deposition, Dr. Brooks testified to a reasonable degree of medical probability that Dennis had a surgically correctable problem had he undergone exploratory surgery on January 6, 2019, and surgery after midnight on January 6th was too late to save Dennis. Tr. 75, 78-79. We also note that Dr. Brooks testified that generally the word "could" means a possibility less than 50%. Tr. 75.

In our opinion, Dr. Brooks's reports and deposition testimony, viewed in their entirety, satisfied the requirement that an expert opinion be stated in terms of probability.

{¶ 30} Relying on *Schlachet v. Cleveland Clinic Foundation*, 104 Ohio App.3d 160, 165, 661 N.E.2d 259 (8th Dist.1995) and *Sweeney v. Deaconess Hosp.*, 8th Dist. Cuyahoga Nos. 64349 and 64357, 1993 Ohio App. LEXIS 6310, 13 (Dec. 30, 1993), the trial court stated that without admissible evidence on the condition that caused Dennis's death, the necessary treatment, and probability of success, the plaintiff's medical expert testimony was insufficient.

{¶ 31} We find *Schlachet* and *Sweeney* are distinguishable. Schlachet's claim was properly dismissed on summary judgment where the plaintiff failed to present sufficient evidence that the defendant-hospital's negligence was the proximate cause of a legally recognized injury. In *Sweeney*, plaintiff's medical expert offered no testimony to a reasonable degree of medical probability that the defendant-hospital's failure to diagnose decedent's illness was the direct and proximate cause of any injury. We find the fact patterns and holdings in *Schlachet* and *Sweeney* inapplicable to the instant matter where Dr. Brooks opined to a reasonable degree of medical probability that the Clinic's failure to recognize Dennis's progressive acidosis and renal dysfunction was the proximate cause of Dennis's injuries.

{¶ 32} Dr. Brooks's opinion was provided with the requisite medical probability and sufficiently described proximate cause. The medical testimony was

reliable and should have been admitted under Evid.R. 702. Accordingly, the trial court abused its discretion when it granted the Clinic's motion in limine.[3]

**Motion for Summary Judgment**

{¶ 33} In Kittis's second assignment of error, she argues that the trial court erred when it granted the Clinic's motion for summary judgment based upon the absence of any expert medical testimony on proximate cause supporting Kittis's medical malpractice claim.

{¶ 34} Before a trial court grants a motion for summary judgment, pursuant to Civ.R. 56(C), the court must determine that

> (1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977).

{¶ 35} On a motion for summary judgment, the moving party's initial burden is to identify specific facts in the record that demonstrate its entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264, (1996). If the moving party does not satisfy this burden, summary judgment is not appropriate. If the moving party meets the burden, the nonmoving party has a

---

[3] We note that following the trial court's order granting the Clinic's motion in limine, Kittis filed a motion for reconsideration and attached an affidavit from Dr. Brooks dated June 21, 2022. Because the motion for reconsideration and affidavit were filed after the court's ruling on the motion for limine that is at issue in Kittis's first assignment of error, the affidavit was not considered in our review of the court's order on the motion in limine.

reciprocal burden to point to evidence of specific facts in the record that demonstrate the existence of a genuine issue of material fact for trial. *Id.* at 293. Where the nonmoving party fails to meet this burden, summary judgment is appropriate. *Id.*

{¶ 36} An appellate court applies a de novo standard when reviewing a trial court's decision that granted summary judgment. *Bayview Loan Servicing, L.L.C. v. St. Cyr*, 2017-Ohio-2758, 90 N.E.3d 321, ¶ 11 (8th Dist.).

{¶ 37} The Clinic's motion for summary judgment argued that Kittis failed to present expert testimony to establish the essential elements of a medical malpractice claim. Specifically, the Clinic argued Kittis failed to present medical evidence that torsion was the proximate cause of Dennis's injuries and death: "In response to the pending [m]otion, [Kittis] is required to establish, more likely than not or within reasonable medical probability, that torsion/closed loop was the proximate cause." Clinic's Reply brief, September 23, 2022, p. 6. In opposition to the motion, Kittis argued sufficient causation evidence was presented through Dr. Brooks's two reports, deposition testimony, and affidavit.[4]

{¶ 38} Based upon this court's sustaining Kittis's first assignment of error — and thereby finding Dr. Brooks's testimony should not have been excluded pursuant to the Clinic's motion in limine — Dr. Brooks's reports and deposition testimony,

---

[4] The record indicates that the trial court denied Kittis's motion for reconsideration, but the trial court did not rule separately on the admissibility of Dr. Brooks's affidavit.

including his causation testimony, is considered in our de novo review of the Clinic's motion for summary judgment.

{¶ 39} In a medical malpractice case a plaintiff must establish through expert testimony, stated to a reasonable degree of medical probability, the acceptable medical standard of care, the defendant's breach of that standard, the plaintiff's injury, and that the defendant's acts were the proximate cause of the injury. *Schura*, 8th Dist. Cuyahoga No. 94359, 2010-Ohio-5246, at ¶ 27, citing *Bruni*, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976). To establish proximate cause in a medical malpractice claim, the plaintiff must introduce evidence that demonstrates it was a probability that the medical staff's alleged negligence caused the plaintiff's injury. *Vactor v. Franklin Blvd. Nursing Home, Inc.*, 8th Dist. Cuyahoga No. 109708, 2021-Ohio-945, ¶ 20, citing *Drew-Mansfield v. MetroHealth Med. Ctr.*, 8th Dist. Cuyahoga No. 102254, 2015-Ohio-3033, ¶ 15, citing *Wilson v. Kenton Surgical Corp.*, 141 Ohio App.3d 702, 705-706, 753 N.E.2d 233 (3d Dist.2001). The plaintiff must also prove proximate cause in a wrongful death claim by establishing a wrongful act, neglect, or default of the defendant was the proximate cause of death. *Burks v. Torbert*, 8th Dist. Cuyahoga No. 91059, 2009-Ohio-486, ¶ 14, citing *Chaney v. Eason*, 8th Dist. Cuyahoga No. 72142, 1997 Ohio App. LEXIS 5786 (Dec. 24, 1997), citing R.C. 2125.01.

{¶ 40} For the same reasons cited above in the analysis of Kittis's first assignment of error, we find that Kittis presented sufficient evidence in support of proximate cause to defeat the Clinic's motion for summary judgment. Dr. Brooks

testified, to a reasonable degree of medical probability that Dennis had a surgically correctable problem on January 6, 2018. Dr. Brooks opined that the Clinic's failure to timely recognize Dennis's progressive acidosis and renal dysfunction that indicated a problem with his bowel was the proximate cause of Dennis's demise. Dr. Brooks stated that had the Clinic recognized these signs and completed the second surgery on January 6, 2018, Dennis could have been salvaged. Such testimony, provided to a medical degree of probability, presented genuine issues of material fact that defeated the Clinic's motion for summary judgment.

{¶ 41} The Clinic's focus on the fact that Dr. Brooks's reports and deposition testimony did not state with the requisite degree of probability what caused Dennis's bowel ischemia is misguided as demonstrated in *Vactor v. Franklin Blvd. Nursing Home, Inc.*, 8th Dist. Cuyahoga No. 109708, 2021-Ohio-945. In *Vactor*, the plaintiff initiated a lawsuit based upon the claims of wrongful death, survivorship, and violation of Ohio's Nursing Home Patient's Bill of Rights. The medical examiner opined that the cause of death was an epileptic seizure and hypertensive cardiovascular disease. The plaintiff's medical expert prepared a supplemental report that stated Vactor's death was more likely than not due to preexisting cardiorespiratory disease and dehydration. During deposition, plaintiff's medical expert could not identify the specific disease that caused Vactor's death. Following discovery, defendants filed a motion for summary judgment arguing that plaintiff's expert did not identify the cause of death to a reasonable degree of medical probability, and plaintiff could not overcome the presumption that the medical

examiner's cause and manner of death were conclusive. The trial court granted the defendants' motion for summary judgment on the basis that (1) plaintiff's expert did not establish the defendants breached a standard of care of the medical community and (2) plaintiff's expert did not establish proximate cause between the alleged negligent acts and Vactor's death.

{¶ 42} On appeal, this court found that "[i]n focusing on the specific medical cause of [Vactor's] death, the parties and the trial court neglected to address the actual issue of proximate cause as it related to the [nursing home's] staff." *Vactor* at ¶ 27. Plaintiff's medical expert stated in his initial report that the defendant's failure to timely transfer Vactor to the hospital was the proximate cause of her death. The medical expert opined at his deposition that it was more likely than not that Vactor would have had a successful outcome if she had been transferred to the hospital on a timely basis. Further, the expert stated Vactor required emergency care on her date of death, and the delay in transferring her to the hospital was more likely than not the cause of her death. Thus, this court found the plaintiff submitted sufficient evidence to establish a jury issue on whether the failure to send Vactor to the hospital caused her death.

{¶ 43} Similarly, the Clinic and the trial court focused on the cause of Dennis's ischemic bowel and thereby neglected to address the actual issue of proximate causation. The focus should have been on Dr. Brooks's statements that the Clinic's failure to recognize the meaning of Dennis's acidosis and renal dysfunction and initiate a second surgery on January 6, 2018, were the proximate

cause of Dennis's injuries and death. Dr. Brooks's reports and deposition testimony provided sufficient evidence to overcome the Clinic's motion for summary judgment.

{¶ 44} Accordingly, the trial court erred when it granted the Clinic's motion for summary judgment. Kittis's second assignment of error is sustained.

{¶ 45} This cause is reversed and remanded to the lower court for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, PRESIDING JUDGE

LISA B. FORBES, J., and
EMANUELLA D. GROVES, J., CONCUR